UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY J. STOKES,

    Petitioner,

v.                                            Case No. 06-10734
                                                Honorable George Caram Steeh

HUGH WOLFENBARGER,

    Respondent,
_____/

## OPINION AND ORDER DENYING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Anthony Stokes, a Michigan state prisoner, acting *pro se*, has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Stokes was convicted by a jury in Michigan's Wayne County Circuit Court of (1) assault with intent to do great bodily harm less than murder, MICH.COMP.LAWS § 750.84, (2) assault with intent to murder, MICH.COMP.LAWS § 750.83, (3) first-degree home invasion, MICH.COMP.LAWS § 750.110(a)(2), and (4) felony firearm, MICH.COMP.LAWS § 750.227b. He was sentenced to (1) five to ten years imprisonment for the assault-with-intent-to-do-great-bodily-harm-less-than-murder conviction, (2) twenty-five to forty years imprisonment for the assault-with-intent-to-murder conviction, (3) seven-and-one-half to twenty years imprisonment for the first-degree-home-invasion conviction, and (4) two years imprisonment for the felony-firearm conviction. Stokes' home-invasion sentence was ordered consecutive to the two assault convictions. His felony-firearm sentence is to be served prior to and consecutive to all other sentences.

Stokes raises six issues in his habeas petition, alleging that he is incarcerated in violation of his constitutional rights. Respondent has filed an answer to the petition asserting that Stokes' claims

either lack merit because the decision of the Michigan Court of Appeals did not result in an objectively unreasonable application of clearly established Supreme Court law, or, that they are procedurally defaulted. This Court agrees. Therefore, the petition will be denied.

## I.  Substantive Facts

This case arises from an incident that occurred on August 17, 2000, at 16541 Evergreen Street, Detroit, Michigan, at the home of Sharon Taylor. According to Taylor's testimony, she knew Stokes for about seven-and-one-half years and lived with him at the Evergreen Street address for three years. It was her testimony that, although Stokes moved out in March 2000, he continued to go over to her house; they were co-owners of a dog and sometimes Stokes would come over to care for the dog. According to Taylor's testimony, Stokes was harassing her, was jealous and suspicious of her and her whereabouts, and had entered her home on several occasions without an invitation. She said that she eventually had the locks on her door changed. It was her testimony that Stokes did not have a key for the new locks. Taylor testified that she also had an alarm installed but that it was not monitored.

Taylor further testified that, after arriving home from attending a family funeral in Mississippi on the night of August 16, 2000, Stokes called her and asked her if he could come over; she said he could not. Taylor said she also received calls that night from both Stokes' mother and his step-father. As a result of those phone calls and because she saw his van parked nearby when she came home from work, it was her testimony that she did not go home that night. Rather, she stayed with a friend until about 10 p.m., and then, she checked herself into a hotel.

According to Taylor, the next morning she went to the local police precinct, reporting her fears and concerns to them. Subsequently, two patrol officers escorted her home. Taylor testified

that when they first arrived at her home, the officers got out of their car and proceeded to go around to the back of her house, looking for signs of obvious entry. Following, the officers went to the front door and, after opening the door for the officers, Taylor testified that she then entered her home, turned on the lights, and turned off the alarm.

It was Taylor's testimony that the officers then looked around the downstairs area and the basement stairway; as they did, one of the officers heard noises from upstairs. Taylor said she then heard three gunshots and, after hearing those shots, she ran out of the house, running toward McNichols Road. According to Taylor, as she was running, she continued to hear more shots coming from the house. When she was about two or three houses away, she stopped, turned around, and saw Stokes coming out of her house. She said she started to run again and heard more shots–about seven to eight. It was her testimony that other police officers began to arrive at the scene around that time. Taylor testified that the police officers surrounded Stokes and that the shooting continued. She said she heard Stokes tell the police officers "go on and shoot me. You're going to have to take me down or take me out." (Trial Tr. vol. II, p. 44, April 11, 2001.)

On cross-examination, Taylor testified that Stokes had previously threatened her not to go to the police, telling her "it would get worse." (Trial Tr. vol. II, p. 94, April 11, 2001.)

The prosecution called several witnesses, who lived near the scene of the incident, and who testified to hearing gun shots, seeing a lady running down the street, and a man shooting at her. One of those witnesses identified Stokes as the man shooting at Taylor, the lady that was running down the street.

William Wilson testified that, on the day in question, while he was in his bedroom, he heard gun shots. According to his testimony, when he heard the gun shots, he looked out the bedroom

window and saw a lady running across the street and a man shooting at her. Wilson described the man as tall, light-skinned, wearing a gray shirt. Wilson testified that he saw the man carrying a gray gun. He said the man continued to shoot at the lady as she was running toward Six Mile Road.

Timothy Huck testified that he heard about four or five gun shots on that day. He said he was upstairs on his computer, which was near the window, when he heard the shots. Hucks said he then looked out the window, saw a lady running down the sidewalk toward Six Mile Road and that a male figure seemed to be following her and shooting at her.

Paula McDonald, another witness, heard the same shots that morning. McDonald testified that she looked out her window and saw a man shooting. According to McDonald, she could not tell what the man was shooting at until she looked further and saw that he was shooting at the police. Shortly after, McDonald said she saw the man lying on the ground, surrounded by the police.

Connie Rikard testified that he was in his bathroom that day when he heard gun shots. He said he opened his window and looked out but did not see anything. Rikard said he subsequently heard a woman hollering, "no, no." (Trial Tr. vol. I, p. 35, April 10, 2001.) According to Rikard's testimony, he said that he then went out onto his porch. After hearing the police siren, Rikard saw a police car make a U-turn on the street. Rikard testified that he saw a man in the middle of the street with a gun; the man was firing toward McNichols Road. Rikard then saw the police jump out of the car. The police told him (Rikard) to step back, which he did. Rikard said he then heard a couple more shots. According to Rikard, he could not identify the man shooting if he saw him again.

Jonathan Turner testified that he did not know Stokes but knew of him. According to Turner, on the day in question, he heard some shots and thought that someone was coming into his house

so, he got up and looked out the window. He said he saw Stokes running after a woman and firing shots at her. Turner testified that he heard five or six shots that morning and told the police that he saw Stokes fire two of those shots.

Shawn Thompson testified that he also heard shots fired that morning. It was his testimony that he looked out of his window and saw a man walking towards McNichols Road. Thompson testified that the man was firing what appeared to be a nine millimeter. Thompson said he saw the man firing the gun about two or three times. He then testified that the man put the gun to his chest and started walking toward Grand River Avenue and, as he walked past Thompson's house, he shot himself. Thompson said he then saw the police coming from the other direction and when the car stopped, the man shot himself again in the chest. He said the man fell and then picked up the gun and shot himself a third time in the chest. According to Thompson, the man was lying on the ground when the police and paramedics arrived on the scene.

Only one of the two officers who had accompanied Taylor back to her house testified for the prosecution–Detroit Police Officer Ronald Kidd. He testified that he and his partner, Officer Pierre Mitchell, were asked to accompany Taylor home on the day in question. According to his testimony, once there, he did not see any signs of forced entry and he said that the doors were locked. Officer Kidd testified that, after entry, they did not announce themselves as the police. It was Officer Kidd's testimony that, while they stood at the bottom of the stairs, he saw Stokes come down the stairs and then fire a gun. He said he returned fire and that a gun battle then followed. Officer Kidd testified that he and Officer Mitchell backed up into the kitchen and then ultimately into the basement. He said they remained in the basement until they no longer heard shots being fired.

Other Detroit police officers, who responded to the scene, testified that they observed Stokes going away from the Taylor residence and that they saw Stokes shoot himself twice.

Hayden Dannug, a forensic chemist, who was employed by the Detroit Police Crime Laboratory, testified that he received three gunshot residue kits, one for Officer Mitchell, one for Officer Kidd, and one for Stokes. Dannug testified that Stokes and both officers tested positive for gunshot residue.

The evidence technician in the case testified that there were numerous spent casings and bullets recovered from the scene, and that all of the recovered nine millimeter casings and bullets were matched to the gun allegedly used by Stokes, and that all of the .40 caliber casings and bullets matched that of the police officers' guns.

When Stokes arrived at the hospital, he was observed to have two wounds to the chest, one to his leg, and, one to his lip. The defense did not present any witnesses.

Officer Mitchell was not produced at trial. The trial court however gave the adverse witness instruction to the jury. Subsequently, the jury returned a verdict of not guilty in regard to the charge of assault with intent to murder Officer Mitchell. However, regarding the remaining charges, the jury found Stokes guilty.

## II. Procedural History

Following his convictions and sentences, Stokes, through counsel, filed a first right of appeal in the Michigan Court of Appeals, raising the following claims:

> I. [Petitioner] was denied the effective assistance of counsel where his trial counsel failed to request that [Petitioner] be evaluated for criminal responsibility.
>
> II. [Petitioner] was denied the effective assistance of counsel where trial counsel allowed [Petitioner] to be sentenced based

     upon the incorrect sentencing grid location for the assault-with-intent-to-do-great-bodily-harm and home-invasion convictions.

Stokes, *pro per*, subsequently filed a supplemental brief, raising the following claim.

  III. [Petitioner] was deprived of a fair trial upon the prosecution's lack of diligence in attempting to produce a *res gestae* witness. [Petitioner] has been prejudiced by the prosecutor for only showing part of the *res gestae*, and part of the whole transaction, which the jury was entitled to have the whole transaction before them.

On July 29, 2003, the Michigan Court of Appeals affirmed Stokes' convictions and sentences. *People v. Stokes*, No. 235905, 2003 WL 21751475 (Mich.App.Ct. July 29, 2003) (unpublished). Subsequently, Stokes filed an application for leave to appeal from that decision in the Michigan Supreme Court, raising the same claims as raised in the Michigan Court of Appeals, which was denied on January 27, 2004. *People v. Stokes*, 469 Mich. 1002, 675 N.W.2d 595 (2004).

Following, on June 1, 2004, Stokes filed a motion for relief from judgment, presenting the following claims:

  I. [Petitioner] was deprived of his Sixth and Fourteenth Amendment rights under state and federal constitutions to have the effective assistance of appellate counsel on his one and only appeal of right.

    A. [Petitioner's] appellate counsel ignored significant and obvious issues while pursuing weaker claims.

    B. [Petitioner's] appellate counsel failed to investigate the facts and circumstances of his case and therefore failed to properly raise and argue [Petitioner's] claims of ineffective assistance of trial counsel on direct appeal.

  II. [Petitioner] was deprived of his Sixth and Fourteenth Amendment rights under the state and federal constitutions to

>   have effective assistance for his defense.
>
>   A. [Petitioner] was deprived of a fair trial because trial counsel's ineffective assistance in failing to have a *res gestae* witness produced at trial and deprived [Petitioner] of a substantial defense.
>
>   B. [Petitioner's] trial attorney failed to investigate the facts and circumstances of his case and therefore failed to present a defense at trial.
>
> III. [Petitioner] was deprived of his constitutional right to a fair trial and due process of law by the cumulative effect of errors.
>
> IV. [Petitioner] has established good cause and actual prejudice required by M.C.R. 6.508(D) and is entitled to relief from judgment.

On September 22, 2004, the trial court issued an opinion and order denying Stokes' motion for relief from judgment. *People v. Stokes*, No. 00-010818-01 (Wayne County Circuit Court Sept, 22, 2004).

Subsequently, Stokes filed an application for leave to appeal from the trial court's decision in the Michigan Court of Appeals, which was denied on April 7, 2005. *People v. Stokes*, No. 258406 (Mich.App.Ct. April 7, 2005). He then filed an application for leave to appeal that decision in the Michigan Supreme Court, which was denied by standard order on October 31, 2005. *People v. Stokes*, 474 Mich. 902, 705 N.W.2d 131 (2005).

Stokes' petition for a writ of habeas corpus was filed with this Court on February 17, 2006. In his petition, Stokes raises the following issues:

>   I. The Petitioner was deprived of Sixth and Fourteenth Amendment rights under the United States Constitution to have the effective assistance of counsel for his defense.

      A.    The Petitioner was denied the effective assistance of counsel where his trial counsel failed to request that the Petitioner be evaluated for criminal responsibility.

      B.    Petitioner was denied the effective assistance of counsel where trial counsel allowed Petitioner to be sentenced based upon the incorrect sentencing grid location for the assault with intent to do great bodily harm and home invasion counts.

II.    Petitioner was deprived of his due process rights provided by the Fourteenth Amendment to the United States Constitution where the prosecutor failed to exercise due diligence in securing the presence of a *res gestae* witness at trial.

III.    Petitioner was deprived of his Sixth and Fourteenth rights under the United States Constitution to have the effective assistance of counsel for his one and only appeal.

      A.    The Petitioner's appellate counsel ignored significant and obvious issues while pursuing weaker claims.

      B.    The Petitioner's appellate counsel failed to investigate the facts and circumstances of his case and therefore to properly raise and argue Petitioner's claims of ineffective assistance of trial counsel on direct appeal.

IV.    Petitioner was deprived of his Sixth and Fourteenth Amendment rights under the United States Constitution to have the effective assistance of counsel for his defense.

      A.    Petitioner's trial counsel failed to have a *res gestae* witness produced at trial which deprived Petitioner a substantial defense.

      B.    Petitioner's trial counsel failed to investigate the facts and circumstances of his case and therefore failed to present a defense at trial.

   V. Petitioner was deprived of his United States Constitutional right to a fair trial and due process of law by the cumulative effect of errors.

   VI. Petitioner has demonstrated good cause for not raising habeas claims III through V on direct appeal and actual prejudice as a result of multiple violations of his constitutional rights to a fair trial and due process of law.

### III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs habeas corpus review of state court decisions. 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under the "contrary to" clause of § 2254(d)(1), a federal court may grant a writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has decided an issue on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts. *Id.* at 407-08. Relief is also available if the state court decision unreasonably extends or unreasonably refuses to extend a legal

principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable." *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

With that standard in mind, the Court proceeds to the merits of the petition for a writ of habeas corpus.

### IV.  Discussion

#### A.  Claim I–Ineffective Assistance of Counsel Claim

In his first claim, Stokes contends that counsel was ineffective because (1) he failed to request that he (Stokes) be evaluated for criminal responsibility and, (2) he allowed him (Stokes) to be sentenced on the basis of an incorrect sentencing grid.

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

With respect to the performance prong of the *Strickland* test, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Strickland*, 466 U.S. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. The court must recognize that counsel is strongly presumed to have

rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

Here, the last state court to issue a reasoned decision in this case, the Michigan Court of Appeals, stated in pertinent part:

> Defendant first contends that he was denied effective assistance of counsel when his attorney failed to request that defendant be evaluated for criminal responsibility. We disagree. Our review of this issue is limited to alleged errors by counsel evident in the existing trial record, *People v. Knapp*, 244 Mich.App 361, 385; 624 NW2d 227 (2002), because defendant failed to preserve this issue for our review by moving for a new trial or evidentiary hearing in the trial court. *People v. Stewart (On Remand)*, 219 Mich.App 38, 42; 555 NW2d 715 (1996).
>
> To establish a denial of effective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficiency was prejudicial to the defendant. *People v. Daniel*, 207 Mich.App 47, 58; 523 NW2d 830 (1994). Defendant claims his trial attorney should have pursued a psychiatric evaluation for him before trial because defendant had exhibited behavior warranting such an evaluation. For purposes of determining whether defendant was denied effective assistance of counsel, we consider whether the omission of the evaluation denied defendant the opportunity to present an insanity defense that had a reasonable likelihood of success. *People v. Nyberg*, 140 Mich.App 160, 165-166; 362 NW2d 748 (1984). There is little evidence in the trial

record to conclude an insanity defense would have had even a narrow possibility of success. One police officer testified that the victim had mentioned that defendant was suicidal. Another police officer testified that the victim had told him she had received a threatening message from defendant that he was going to kill her and then himself.

Unless defendant has an extensive history of mental instability, a trial counsel's failure to pursue a psychiatric evaluation or raise an insanity defense does not constitute ineffective assistance of counsel. *People v. Parker*, 133 Mich.App 358, 363; 349 NW2d 514 (1984). Because the evidence in this case fails to establish such an extensive history, defendant cannot show either that trial counsel's failure to pursue a criminal responsibility evaluation constituted deficient performance, or that he suffered any prejudice because he was not evaluated. *Id.*

\* \* \*

Defendant last argues that he was denied effective assistance of counsel because he was sentenced on the assault with intent to do great bodily harm less than murder and first-degree home invasion convictions based upon incorrect sentencing guidelines. We disagree. Because the current offenses occurred in August 2000, the Michigan statutory sentencing guidelines apply as set forth at M.C.L. § 777.1 *et seq*. Under the sentencing guidelines act, a court must impose a sentence in accordance with the appropriate sentence range. MCL 769.34(2), *People v. Hegwood*, 465 Mich. 432, 438; 636 NW2d 127 (2001).

The record shows that defense counsel and prosecutor agreed at the sentencing hearing the offense variables would be scored as follows: OV1, 25 points; OV2, five points; OV3, zero points; OV4, ten points; OV5, zero points; OV6, 50 points; OV7, zero points; OV8, zero points; OV9, 10 points; OV10, 15 points. As the points for OV6 do not apply to the first-degree home invasion and assault with intent to do great bodily harm less than murder convictions, defendant's offense variable point total is 65 on these two convictions (Grid D-V). Therefore, the guideline ranges of 29 to 71 months on the assault conviction, and 78 to 162 months on the home invasion conviction, were correctly calculated and applied by the trial court. Because the sentences imposed were within the proper guidelines ranges, defendant is not entitled to relief. *People v. Babcock*, 244 Mich.App 64, 73; 624 NW2d 479 (2000) ( *Babcock I* ); MCL

769.34(10).

> Defendant's convictions are affirmed, and we remand for correction of the sentencing information reports for the home invasion and assault with intent to do great bodily harm less than murder convictions. We do not retain jurisdiction.

*Stokes*, No. 235905, 2003 WL 21751475, slip op. at pp. 1-3.

In this case, the Michigan Court of Appeals correctly concluded that Stokes' claim, that trial counsel was ineffective for failing to pursue a psychiatric evaluation, was without merit because the omission of the evaluation did not deny him the opportunity to present an insanity defense that had a reasonable likelihood of success. As the court of appeals noted, "[t]here is little evidence in the trial record to conclude an insanity defense would have had even a narrow possibility of success." *Stokes*, No. 235905, 2003 WL 21751475, slip op. at p. 1. Furthermore, regarding Stokes' other ineffective assistance of counsel claim, the court of appeals also correctly noted that he failed to demonstrate the requisite prejudice because the guidelines ranges were correctly calculated and applied by the trial court. Stokes is therefore not entitled to habeas relief on his ineffective assistance of counsel claims.

### B. Claim II–Prosecutor's Failure to Produce a *Res Gestae* Witness

In his second habeas claim, Stokes argues that his due process rights were violated when the prosecutor failed to produce a *res gestae* witness–Detroit Police Officer Pierre Mitchell.

Errors of state law do not provide a basis for habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ( "Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." ). Thus, Stokes' claim that the prosecutor violated state law regarding the production of *res gestae* witnesses is not cognizable on

habeas review. *See Johnson v. Hofbauer*, 159 F.Supp.2d 582, 601 (E.D.Mich.2001) (Tarnow, J.).[1]

Regarding this issue, the Michigan Court of Appeals stated:

> Defendant next argues in propria persona that the prosecutor failed to exercise due diligence in securing the presence of a [*res gestae*] witness, Officer Mitchell of the Detroit Police Department, and that the jury instruction given by the trial court, that the jury could infer that as a missing witness, Officer Mitchell would have testified unfavorably to the prosecution, was insufficient to cure the prejudice created by the Officer Mitchell's absence. We disagree.
>
> The prosecutor's duty with respect to [*res gestae*] witnesses is not as broad as that asserted by the defendant. As we held in *People v. Perez*, 255 Mich.App 703, 710; 622 NW2d 446 (2003), M.C.L. § 767.40a(1) and (2) require the prosecution to list any such witnesses actually known to the prosecution at the time the information is filed and up to the time of trial, and M.C.L. § 767.40a(3) requires the prosecution to provide defendant with a list of the witnesses the prosecution intends to call at trial not less than 30 days before trial. "MCL 767.40a(5) requires the prosecutor and the police to provide the defendant with assistance "to locate and serve process upon a witness" at the defendant's request," but does not actually impose a duty on the prosecution to produce the witness. *Id.* M.C.L. § 767.40a imposes no duty on the prosecution with respect to a [*res gestae*] witness once the prosecution has subpoenaed that witness, and the statute does not penalize the prosecution when the subpoenaed witness fails to honor the subpoena. *Id.*
>
> In the present case, the prosecution subpoenaed Officer Mitchell almost two months in advance of trial and did [not] learn until just prior to trial that he had been furloughed from the department. Despite attempts to contact him at his home, the prosecution was unable to reach him personally. Eventually, the prosecution was advised that Officer Mitchell was on vacation and

---

[1] Although there is no published Sixth Circuit decision directly on point, in a number of unpublished decisions the Sixth Circuit has reached this conclusion. *See, e.g., Smith v. Elo*, No. 98-1977, 1999 WL 1045877 (6th Cir. Nov. 8, 1999) (*per curiam*); *Moreno v. Withrow*, No. 94-1466, 1995 WL 428407 (6th Cir. July 19, 1995) (*per curiam*); *Lewis v. Jabe*, No. 88-1522, 1989 WL 145895 (6th Cir. Dec. 4, 1989) (*per curiam*); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710 (6th Cir. Aug. 24, 1988) (*per curiam*).

> would not return until the trial had been completed. The trial court instructed the jury that it could infer Officer Mitchell's testimony would be unfavorable to the prosecution. Pursuant to Perez and M.C.L. § 767.40a, once the prosecution subpoenaed Officer Mitchell for trial it had no obligation to do anything to produce him for trial. Thus, defendant was not prejudiced by any conduct of the prosecution. Moreover, the trial court's instruction to the jury that it could infer that Officer Mitchell would have testified favorably to the defendant, even though defendant was not entitled to this instruction, actually inured to defendant's benefit as he was acquitted by the jury of the charge that he assaulted Officer Mitchell with the intent to murder. We find no error requiring reversal.

*Stokes*, No. 235905, 2003 WL 21751475, slip op. at p. 2.

Against that backdrop, the Court finds that the Michigan Court of Appeals' decision regarding this issue is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The court of appeals correctly noted that Stokes failed to demonstrate that he was prejudiced by any of the prosecutor's conduct. Furthermore, the trial court instructed the jury that it could infer that Officer Mitchell's testimony would be unfavorable to the prosecution, and, the jury acquitted Stokes of the charge that he had assaulted Officer Mitchell with intent to murder. Therefore, Stokes is not entitled to habeas relief regarding this claim.

### C.  Claims III-V.

In his third habeas claim, Stokes alleges that his appellate attorney was ineffective for (1) ignoring significant and obvious issues while pursuing weaker claims, and, (2) failing to raise Stokes' ineffective assistance of trial counsel claims on direct appeal. In his fourth habeas claim, Stokes alleges ineffective assistance of trial counsel–specifically, Stokes claims trial counsel was ineffective for (1) failing to have *res gestae* witness Officer Mitchell produced at trial, (2) failing to investigate the facts and circumstances of his case, and, (3) failing to present a defense. In his fifth habeas claim, Stokes alleges that the cumulative effect of the errors deprived him of a fair trial.

Respondent contends that these claims are procedurally defaulted. The Court agrees.

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir.1991). A petitioner's procedural default in the state courts will preclude federal habeas review if the last state court rendering a judgment in the case rested its judgment on the procedural default. *Wainwright*, 433 U.S. at 85; *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir.2001). In such a case, a federal court must determine not only whether a petitioner has failed to comply with state procedures but also whether the state court relied on the procedural default or, alternatively, chose to waive the procedural bar. "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last explained state court judgment should be used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

Here, Stokes' claims are procedurally defaulted. Stokes raised these claims for the first time in his motion for relief from judgment. The trial court denied that motion, and the court of appeals denied his application for leave to appeal that decision for failure to establish grounds for relief pursuant to M.C.R. 6.508(D). Likewise, the Michigan Supreme Court relied upon M.C.R. 6.508(D) in denying Stokes' leave to appeal on these issues.

M.C.R. 6.508(D) provides, in part, that a court may not grant relief to a petitioner if the motion for relief from judgment alleges grounds for relief which could have been raised on direct

appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom.  See M.C.R. 6.508(D).  The state court's decision, while brief, was based upon an independent and adequate state procedural rule. *See Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000).  Although the Michigan Supreme Court did not fully explain its decision, the record indicates that Stokes failed to properly raise these claims on direct appeal of his convictions, despite the opportunity to do so.  Since the state appellate courts were the last state courts rendering judgments in this case, their decision denying his claims on the basis of a state procedural bar prevents federal habeas review.  *Id.*

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). To the extent that Stokes attempts to establish cause to excuse his procedural default by claiming ineffective assistance of appellate counsel for failing to raise his claims in direct appeal, he does not do so.  However, even assuming that he can establish cause to excuse his default, however, he cannot demonstrate actual prejudice; Stokes' defaulted claims lack merit and do not warrant habeas relief.

The mere failure to raise a claim, even if it is meritorious on appeal, does not constitute ineffective assistance of appellate counsel sufficient to establish cause to excuse a procedural default.  *Rust v. Zent*, 17 F.3d 155 (6th Cir. 1994).  The United States Supreme Court, in *Smith v. Robbins*, 520 U.S. 259 (2000), stated, among other things:

> In *Jones v. Barnes*, 463 U.S. 745 (1983) [parallel citations omitted], we held that appellate counsel who filed a merits brief need not (and

> should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent. See, e.g., *Gray v. Greer*, 800 F.2d 644, 646 (C.A. 7 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome")

*Smith v. Robbins*, 520 U.S. at 288; *See also McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000) (where claim was not "dead bang winner," the petitioner's appellate counsel's failure to raise it on direct appeal did not constitute cause to excuse procedural default).

In this case, the record reveals that various issues were raised in Stokes' direct appeal, but that his convictions were affirmed. Stokes fails to demonstrate that the issues that were allegedly ignored by his appellate counsel in his direct appeal were clearly stronger than those that were presented, and he has failed to overcome the strong presumption that his counsel was competent.

Moreover, Stokes has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires [a] petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. Stokes has made no such showing.

Since Stokes has failed to establish cause for his procedural default, there is no need to determine whether he can meet the prejudice prong of the "cause and prejudice" test. *Smith v.*

*Murray*, 477 U.S. 527 (1986); *Long v. McKeen*, 722 F.2d 286 (6th Cir. 1983). Because he has failed to meet his burden of establishing cause and prejudice for his procedural default, and, because he has failed to establish a showing of fundamental miscarriage of justice, the claims are not cognizable under federal habeas review. Therefore, he is not entitled to habeas relief on these remaining claims.

Moreover, Stokes is also not entitled to habeas relief on a cumulative error theory. "[T]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447, (6th Cir. 2002), opinion corrected on denial of rehearing, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

Against that backdrop, the Court finds that Stokes is not entitled to habeas relief.

## V. Conclusion

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Stokes has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

Dated: September 24, 2008

>   S/George Caram Steeh
>   GEORGE CARAM STEEH
>   UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 24, 2008, by electronic and/or ordinary mail.
S/Josephine Chaffee
Deputy Clerk

---